IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

PHILIP DIESER,

              Plaintiff,

    v.

GLOUCESTER COUNTY OFFICE OF
THE SHERIFF and WILLIAM LONG,

              Defendants.

HON. JEROME B. SIMANDLE

CIVIL NO. 03-2039

**OPINION**

APPEARANCES:

S. Robert Freidel, Esq.
Christina Y. Emery, Esq.
THE LAW OFFICE OF S. ROBERT FREIDEL, JR., ESQ.
University Executive Campus
151 Fries Mill Road
Suite 303
Turnersville, NJ 08012
    Attorneys for Plaintiff

William M. Tambussi, Esq.
Susan M. Leming, Esq.
BROWN & CONNERY, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
    Attorneys for Defendant Gloucester County Office of the
    Sheriff

John C. Eastlack, Jr., Esq.
HOLSTON, MACDONALD, UZDAVINIS & ZIEGLER
66 Euclid Street
P.O. Box 358
Woodbury, NJ 08096
    Attorney for Defendant William Long

**SIMANDLE**, U.S. District Judge:

On September 25, 2001, Plaintiff, a Sheriff's Officer in the

Gloucester County Office of the Sheriff, alleges he overheard

Defendant William Long make a racially derogatory comment about

an African-American co-worker.  Plaintiff immediately reported
the comment to supervisors and co-workers.  According to the
Complaint, Defendants subsequently retaliated against Plaintiff
in violation of Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000(e)(3), and the New Jersey Law Against
Discrimination, N.J.S.A. 10:5-1 et seq.

Defendant Gloucester County Office of the Sheriff has moved
for summary judgment.  For the following reasons, the motion will
be granted in its entirety.

**I.   BACKGROUND**

A.   <u>Plaintiff's Employment History Within the Department</u>

Plaintiff Philip Dieser has been employed as a Sheriff's
Officer in the Gloucester County Office of the Sheriff
("Sheriff's Office" or "Department") since 1990.  (Dieser Tr.,
Pl. Ex. A, 5:15-24.)  All of the positions held by Plaintiff from
that time through the relevant period were "bidded positions" –
officers within the Department would bid for a position, and the
bid would then be accepted or rejected based primarily on the
individual's qualifications and seniority.  (<u>Id.</u> at 20:10-21.)

In 1990, Plaintiff bid on and received an assignment in the
court security unit.  (<u>Id.</u> at 13:14-15.)  After serving in that
unit for approximately three to four years, Plaintiff
successfully bid on a position in the transportation unit, where

he worked first at night, and then during the day.[1]  (<u>Id.</u> at 13:24-14:1; 20:18-21.)

At some point during his service in the transport division, Plaintiff successfully bid on a position in the K-9 unit and was assigned a bloodhound named King.  (<u>Id.</u> 20:18-21.)  According to Plaintiff, because he could not transport prisoners with King in his police car, he was transferred to the process servers unit. (<u>Id.</u> at 14:7-17.)  Following the transfer, if Plaintiff were to receive a K-9 call while serving process, he could immediately respond.

Prior to December 2001, Plaintiff was part of the "first responder" team of the K-9 unit.  (<u>Id.</u> at 115:7-14.)  According to Plaintiff, that assignment involved immediate response to calls requesting assistance in locating, for example, fleeing felons, missing persons, and weapons.[2]  (<u>Id.</u> at 15:1-13.) Additionally, Plaintiff and his K-9 assisted in tracking

---

[1] In February 2004, Plaintiff was transferred to the night transport unit.  (Dieser Tr. at 19:11-20:5.)  Sometime thereafter, Plaintiff unsuccessfully bid on a transfer to the day transport unit.  Plaintiff maintains that his bid would have been successful, but for Defendant effectively forcing a more senior officer, Officer Synsavage, to bid on that same assignment. Because that officer was senior to Plaintiff, Synsavage's bid was accepted.  (<u>Id.</u> at 163:6-165:8.)  Eventually, Synsavage requested that he be removed from the day transport unit.  He was, and in December 2004, Plaintiff was assigned to fill that vacancy.  (<u>Id.</u> at 165:20-23.)

[2] Before responding to calls, Plaintiff was required to first call his supervisor.  Once the supervisor gave Plaintiff permission, Plaintiff and King would respond.  (<u>Id.</u> at 15:1-6.)

arsonists from crime scenes.  (Id.)

According to Plaintiff's testimony, the frequency of calls seeking K-9 assistance varied.  For example, there were times when Plaintiff received two or three calls in a single day, and others when Plaintiff would not get a call for several weeks. (Id. at 18-22.)  All costs associated with the training, grooming, and caring for King were covered by the Sheriff's Office.  (Id. at 15:9-23.)

B.   Temporary Reassignments

Occasionally, officers who were assigned to a particular unit in the Department would be "reassigned" to special detail or to perform other duties.  These "reassignments" were temporary, though, and the officers who were reassigned remained permanently assigned to their "bidded positions."  (Id. at 22:11-19.) Plaintiff claims that during the relevant period, the Sheriff's Office utilized a "power pool," comprised of 2 to 3 officers on any given day, to determine reassignments.  Lieutenant Albreacht testified that the power pool was comprised of junior and senior officers.  (Albrecht Tr., Def. Ex. DD, 20:13-16.)  According to Albrecht, numerous ranking officers, and, in particular, process servers, were subject to daily reassignment.  (Id. at 16:15-20.) According to Plaintiff, during the relevant period there was no rotation system in place to ensure even distribution of additional work.  (Dieser Tr. at 124:9-20.)

4

Plaintiff maintains that he was reassigned nine times in the year prior to the alleged incident.[3] (Id. at 22:20-23:7; see Pl. Ex. S[4]; Pl. 2/27/06 Chart.)  On September 25, 2001, Plaintiff filed a written internal grievance complaining of having been reassigned two days earlier.  (Pl. Ex. F.)  According to the grievance, at 10:30 P.M. on September 23, 2001, Plaintiff was called at home and ordered to report to Cooper University Hospital to "work hospital duty."  Plaintiff alleged that this reassignment was made without regard to seniority, and in contravention to the "seniority list."  (Id.)  The grievance was submitted to Defendant Undersheriff William Long on September 25, 2001, and to James Cannon, Personnel Director, on September 27, 2001.

C.  September 25, 2001 Incident

Plaintiff alleges that on September 25, 2001, he overheard Defendant William Long, an undersheriff in the Sheriff's Office, say to undersheriffs Silver, Fish and Catalano: "That fucking nigger always has that phone glued to his fucking ear."  (Dieser

---

[3] Of the nine alleged reassignments, five involved, at least in part, transports.  As discussed below, the Court holds as a matter of law that reassignments to transport under the facts of this case do not constitute adverse employment action.

[4] Plaintiff previously submitted a chart detailing his reassignments.  That exhibit was marked as Plaintiff's Exhibit S. By letter dated March 8, 2006, Plaintiff submitted a more comprehensive chart which superseded the prior exhibit.  All references herein to Plaintiff's Exhibit S are to Plaintiff's most recent submission.

Tr. at 45:13-17.)  According to Plaintiff, Defendant Long was referring to Officer Chris Harris, an African American corrections officer employed at the Gloucester County Corrections Facility.  (Id. at 45:22-25.)

Almost immediately following the incident, Plaintiff claims he reported Long's comment to officers Ray Dilks, Charlie Fare, Sergeant Bruce Scott and Acting Sergeant Bill Barnett.  (Id. at 25:1-7; 49:15-18.)  According to Plaintiff, he asked those individuals how to proceed as to filing a complaint.[5]  (Id. at 50:8-51:16.)  Additionally, Plaintiff complained to Lieutenants Daisey and Sergeant Johns about what he had overheard.  (Id. at 24:23-15; 58:12-18.)  Plaintiff claims to have also discussed the comment with others in the department shortly after the incident. (Id. at 58:12-18.)  Plaintiff alleges he described to a secretary, Toni Clancy, what he had overheard, and asked how he should proceed.  About one week later, Plaintiff maintains he had a similar conversation with another secretary, Barb Graci.

Plaintiff alleges that he first told Chief Silvert that he intended to file an EEOC complaint on December 7, 2001, immediately after Defendant Long suggested to Plaintiff that he withdraw from the K-9 Unit.  (Pl. Ex. H, #18.)  According to

---

[5] Anthony Wilcox, Deputy Personnel Director of the Sheriff's Office, testified that during the relevant time there was no clear procedure in place within the department for making complaints of discrimination.  (Wilcox Tr., Pl. Ex. E, 23:4-10.)

Plaintiff, Long suggested that Plaintiff's status in the K-9 Unit was preventing him from performing other duties.  (Pl. Counterstatement ¶ 47.)  In fact, Plaintiff did not file an EEOC Complaint until March 20, 2002.  (Def. Ex. AA; Dieser Tr. at 68:8-15.)

        D.   Alleged Retaliation

        According to the Complaint, immediately following Plaintiff's discussions with supervisors and co-workers regarding Long's comment, Defendant began retaliating against Plaintiff in primarily two ways.  First, Defendant allegedly reassigned Plaintiff with greater frequency and disproportionately to his level of seniority following the incident.[6]  Second, Plaintiff alleges that he was demoted within the K-9 unit from the "first-response team" to the "K-9 reserve team," and was eventually removed from the Unit altogether after King died.  (Id. at 115:10-14.)

            1.   Reassignments

        Starting immediately after he reported Defendant Long's comments to supervisors and co-workers, Plaintiff alleges he was

────────────────────

        [6] Plaintiff also claims that he received a negative performance evaluation in June, 2002, for having lost his Motor Vehicle Summons and Warning Book on January 25, 2002.  (Pl. Opp. Br. at 19.)  In fact, though, while the performance evaluation did note the January incident, Plaintiff acknowledges that he otherwise received the highest possible marks in all categories. (Id. at 20.)

7

reassigned frequently.[7]  According to the chart prepared by Plaintiff, over the course of the relevant period, roughly 40 months, Plaintiff was reassigned approximately 160 times.  (See Pl. Ex. S.)  For example, Plaintiff was reassigned to do transports, security detail, fingerprinting and extraditions. According to Plaintiff, these reassignments were frequently made when other, more junior officers were available.

        2.   Transfer Within the K-9 Unit

Prior to the September 25th incident, Plaintiff was a member of the first-response team.  In that capacity, Plaintiff was able to respond immediately to K-9 calls because he was accompanied by King while performing his duties in the process unit.  (Dieser Tr. at 115:7-9.)

Plaintiff claims that after he reported the incident, he was transferred to the K-9 reserve team.  (Id. at 115:10-22.) According to Plaintiff, the only difference between the reserve and first-response teams was Plaintiff's ability to keep King in the car while on assignment.  Plaintiff alleges he was effectively transferred to the reserve team on December 17, 2001, when Lieutenant Catalano instructed him to keep King at home during work hours.  (Id. at 114:1-21.)  Thereafter, whenever a K-9 call went out, Plaintiff would have to first travel home to

---

[7] Sometime in early November, 2001, Plaintiff began to keep a log of his reassignments.

retrieve King.  According to Plaintiff, on several occasions where an immediate response was needed, he was told not to respond because it would take too long for him to first return home for King.[8] (Id. at 114:24-115:6.)

By letter dated January 4, 2002, Fraternal Order of Police, Lodge #97 President, Jeffrey Oswald, requested reconsideration of the decision to transfer Plaintiff and King to a "support role." Sheriff Gilbert Miller, III, responded by internal memorandum dated January 14, 2002, stating in part:

> I would like to explain the reasoning and outline all of the facts that promulgated my decision to order King into a "support role."
>
> Prior to the re-deployment of the K-9 partner assigned to S/O Philip Dieser, Undersheriff Fischer and Lieutenant Catalano had a meeting with Officer Dieser. During that meeting Officer Dieser stated that a vast majority of his K-9 calls occur during his off duty time.  In fact, Officer Dieser noted that during 2001 he believed that he was only called 9 or 10 times during his regular working hours.
>
> That 9 or 10 times equates to less than one call per month during duty time.  In addition, it was pointed out to Officer Dieser that most of those calls were responding in the "support mode" and not as a first responder.  The K-9 teams assigned to the Gloucester County Sheriff's Department that are more likely to be called as first responders will continue to have their K-9 partners with them for speedy access. . . .

---

[8] Plaintiff also claims that on January 18, 2002, his radio was taken away and the K-9 channels were removed.  (Pl. Counterstatement ¶ 58.)  That allegation is seemingly belied by the fact that Plaintiff claims to have received a K-9 call the very next day.  (Id. at ¶ 59.)  Indeed, Plaintiff responded to that call after returning home to pick-up King.  (Id.)

> It is my decision and belief that Officer Dieser would
> be more productive to the Gloucester County Sheriff's
> Department and the citizens of Gloucester County
> functioning in his present assignment in the Field
> Services Bureau.
>
> In closing, I have considered the response time and the
> function and service that King provides to the county
> when called into service.  I emphasize that the safety
> of the residents of this county was foremost in my
> decision and [my decision] was not made lightly.

(Def. Ex. O.)  Sheriff Miller also ordered two K-9 units to
maintain their "first responder status."  (Id.)  On March 29,
2002, King died.  King was not replaced and Plaintiff was removed
from the K-9 unit shortly thereafter.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the materials of record
"show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the
evidence is such that a reasonable jury could return a verdict
for the non-moving party."  See Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986).  A fact is "material" only if it might
affect the outcome of the suit under the applicable rule of law.
Id.  Disputes over irrelevant or unnecessary facts will not
preclude a grant of summary judgment.  Id.

In deciding whether there is a disputed issue of material
fact, the court must view the evidence in favor of the non-moving
party by extending any reasonable favorable inference to that

10

party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

## III.  DISCUSSION

Title VII of the Civil Rights Act of 1964 provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . .

42 U.S.C. § 2000e-3(a).  Under Section 2000e-2(a)(1):

> It shall be an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, [or] color . . . .

42 U.S.C. § 2000e-2(a)(1).[9]

---

[9] Defendant does not dispute that the underlying incident would qualify as discrimination based on race under 42 U.S.C. § 2000e-2(a)(1).

A.   <u>Prima Facie Retaliation Claim</u>

To establish a prima facie case for discriminatory retaliation under Title VII, a plaintiff must demonstrate: (1) that he engaged in a protected activity; (2) that the employer took an adverse employment action against him; and (3) a causal connection between the protected activity and the adverse employment action.[10]  <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1299 (3d Cir. 1997) (quoting <u>Nelson Upsala College</u>, 51 F.3d 383, 386 (3d Cir. 1995)).

1.   <u>Protected Activity</u>

"[I]nformal complaints of discrimination that [are] directed at co-workers rather than management constitute protected activity for purposes of establishing a prima facie case of retaliation." <u>Hazen v. Modern Food Services, Inc.</u>, 2004 U.S. App. LEXIS 21467, at *4 (3d Cir. Oct. 15, 2004) (citing <u>Neiderlander v. American Video Glass Co.</u>, 80 Fed. Appx. 256, 259 (3d Cir. 2003)).  Here, as recounted fully above, Plaintiff claims that almost immediately following the incident he reported Long's comment to officers Ray Dilks, Charlie Fare, Bruce Scott

---

[10] Plaintiff does not argue that there is evidence of direct retaliation.  Accordingly, the Court will analyze the instant motion under the familiar burden-shifting framework originally identified in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Moreover, as claims under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 <u>et</u> <u>seq.</u>, are analyzed under the same framework as Title VII claims, Plaintiff's federal and state claims will be treated together.  <u>Turner v. Schering-Plough Corp.</u>, 901 F.2d 335, 341 (3d Cir. 1990).

and Bill Barnett.  Plaintiff also claims to have spoken about the comment with Sergeant Jones and Lieutenants Daisey and Johns, as well as secretaries Toni Clancey and Barb Graci.  (Id. at 58:12-18.)  Plaintiff's informal complaints to co-workers and supervisors constitute protected activity.  See Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001) (holding employee's complaints to employer, "whether oral or written, formal or informal, are sufficient to satisfy the first prong of the prima facie case, provided the complaints expressed [the plaintiff's] opposition to a protected activity under Title VII").

Defendant argues that even if such informal complaints are sufficient, Plaintiff did not report the incident with the requisite particularity.  See Barber v. CSX Distribution Services, 68 F.3d 694, 701-02 (3d Cir. 1995).  While it is true that "[c]omplaints that are too vague or that make a general complaint about unfair treatment without alleging that the employer engaged in unlawful discriminatory conduct do not qualify as protected activity," id., the Court is satisfied that, at the very least, there is a dispute of fact as to this issue.

In Barber, 68 F.3d at 701-02, the court did not find the requisite specificity where the plaintiff merely wrote a letter to Human Resources complaining about unfair treatment in general and expressing his dissatisfaction that someone else was awarded

13

the position he sought.  Unlike that case, though, Plaintiff here specifically complained to a number of individuals within the Department about the racially derogatory comment allegedly made by Defendant Long.  Accordingly, the Court finds that there is a dispute of material fact as to whether Plaintiff engaged in protected activity.  Since Plaintiff is the party opposing summary judgment, this Court assumes, for purposes of this Opinion, that he engaged in protected activity on September 25, 2001.

     2.  Adverse Employment Action

     Following the incident, Plaintiff alleges he was retaliated against by Defendant in primarily two ways.  First, following the incident Plaintiff claims that he was reassigned with considerably greater frequency than in the preceding year.  Second, Plaintiff claims that he was demoted from the first-response team within the K-9 Unit to the reserve team, and eventually permanently removed from the Unit altogether.[11]  The Court will discuss each allegation in turn.

     "Retaliatory conduct other than discharge or refusal to rehire is . . . proscribed by Title VII only if it alters the employee's 'compensation, terms, conditions, or privileges of

_____

     [11] Plaintiff also claims that he received a negative performance evaluation in June, 2002, for having lost his Motor Vehicle Summons and Warning Book on January 25, 2002.  (Pl. Opp. Br. at 19.)  For reasons already explained, that claim is lacking.

14

employment,' deprives him or her of 'employment opportunities,' or 'adversely affects his [or her] status as an employee.'"[12] <u>Robinson</u>, 120 F.3d at 1300.  "[N]ot everything that makes an employee unhappy" constitutes retaliation, for "otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" <u>Id.</u>

At the outset, the Court rejects Plaintiff's claims as they relate to his reassignment to warrants, extraditions, fingerprinting, evidence control and prisoner transport.  In the first instance, Plaintiff acknowledges that those tasks are typically reserved for detectives.  (Pl. Cert. ¶ 4.)  The Court finds that in these circumstances there can be no adverse employment action where the reassignments were to tasks typically performed by officers of equal rank.[13]  That detectives receive specialized training to perform those tasks, while Plaintiff did not, (<u>see</u> Pl. Cert. ¶¶ 3-5,) only serves to highlight that these

---

[12] "Courts have operationalized the principle that retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment into the doctrinal requirement that the alleged retaliation constitute 'adverse employment action.'" <u>Robinson</u>, 120 F.3d at 1300.

[13] Plaintiff refers to detectives in his written submissions to the Court as junior in rank.  When pressed at oral argument, however, counsel for Plaintiff conceded that detectives are not junior to the position of sheriff's officer.  That is the Court's understanding as well.

assignments were not beneath him.  Thus, for example, the Court
holds as a matter of law that Plaintiff's temporary reassignment
to the duties of "transportation sergeant," (see Pl. Ex. S at 31,
9/11/2002 entry,) was not an adverse employment action.
Likewise, no adverse employment action occurred when Plaintiff
was reassigned to perform transports together with a higher
ranking officer.  (Id. at 46, 5/30/2003 entry.)

Second, no evidence supports the argument that Plaintiff's
reassignments to transport constitutes adverse employment action.
Indeed, Plaintiff "bid" for that very assignment subsequent to
the 2001 incident.[14]  Plaintiff will not be compensated for being
temporarily reassigned to a position he actually desired to have.

Next, the Court also holds that a reasonable jury could not
find that the remaining instances of reassignments between
September 27, 2001 and February 2004 constitute adverse
employment action.  When the temporary duties of warrants,
extraditions, fingerprinting, evidence control and prisoner
transports are excluded from the calculation, there remain fewer
than fifty total reassignments from September 27, 2001 through
February 2004.  Without more, approximately two days of temporary

_____

[14] As recounted more fully above, Plaintiff testified at his
deposition that he was permanently assigned to transport in
February of 2004.  Of the 71 alleged instances of reassignments
between May 2003 and February 2004, however, 38 were to
transport.  Under these circumstances, the Court is unpersuaded
that these reassignments can be considered adverse employment
action for purposes of a Title VII retaliation claim.

16

reassignments every month may not form the basis of a retaliation claim where the terms or conditions of the plaintiff's employment remain largely unchanged.

In Bacone v. Phila. Hous. Auth., 2004 U.S. App. LEXIS 20592, at *2-3 (3d Cir. Sept. 30, 2004), the Third Circuit held that the plaintiff had failed to raise a triable issue of material fact over whether evidence of sexual harassment was pervasive enough to alter the terms of his employment under Title VII.  The behavior at issue in that case involved four incidents during the span of two weeks.  Although the court found the incidents to be offensive, it held that they were not pervasive enough rise to the level of a Title VII violation.

Similarly here, the infrequency of the alleged temporary reassignments can not, as a matter of law, constitute adverse employment action.  Based on the evidence submitted by Plaintiff, the reassignments were made on average, only two times per month.[15]  See Haynes v. Smith, 2006 U.S. Dist. LEXIS 9022, at *20 (D.N.J. March 2, 2006) (granting summary judgment in favor of defendant on New Jersey CEPA claim where "few-week transfer" to a different part of the hospital was not an adverse employment action).  Even viewing the evidence in the light most favorable

_____

[15] As already explained, reassignment to warrants, extraditions, fingerprinting, evidence control and prisoner transport can not under the circumstances presented here constitute adverse employment action, even when viewed as a whole.

to Plaintiff, as the Court must, the reassignments were no more than day-long variations of Plaintiff's regular duties, with no reduction in compensation, terms, conditions or privileges of employment.

Moreover, there is nothing in the record suggesting that the reassignments were to less desirable positions.  At the time of the reassignments, Plaintiff was permanently assigned to the process unit.  In that capacity, Plaintiff was charged with serving process.  Plaintiff has not demonstrated how a reasonable jury could conclude how, for example, security detail or prisoner transport was objectively less desirable than serving process. While Dieser is clearly dissatisfied with his reassignments, his subjective feelings by themselves will not render the challenged employment action adverse.  See Kelleher v. Flawn, 761 F.2d 1079, 1086 (5th Cir. 1985) (holding plaintiff's subjective perception that one position is more desirable than another not controlling).

Cases cited by Plaintiff are not to the contrary.  In Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107, 115-16 (3d Cir. 1996), the court reversed the district court's grant of summary judgment on plaintiff's claim of retaliation. There, Hampton claimed that his rights were violated in violation of Title VII and the New Jersey Law Against Discrimination when the defendants "suddenly" removed him from the detective bureau

18

and permanently reassigned him to road patrol.  The reassignment,
which was supposed to have been temporary, was made without
explanation and "on the heels" of the plaintiff's EEOC complaint.
Id. at 116.

      The defendants argued that Hampton's transfer was merely a
reassignment and not a demotion, as neither Hampton's rank, nor
his pay were decreased.  The defendants further argued that the
reassignment was part of a routine rotation schedule that
required officers to rotate from one department to another every
three to five years.  The court rejected the defendants'
arguments, finding that although the rotation may not be a
demotion, the road patrol assignment was less desirable than that
of detective bureau.  Ultimately, the court held that the
"significance of [those] facts should be resolved by jury
deliberations, not motions for summary judgment."  Id.

      In Nardello v. Township of Voorhees, 377 N.J. Super. 428,
436 (App. Div. 2005), the plaintiff alleged retaliation following
his performance of certain protected acts, including conducting
an internal investigation regarding the alleged misconduct of a
fellow officer.[16]  After performing the investigation, the
plaintiff was denied permission to obtain firearms instructor
training relative to his membership on the SWAT team; he was

_____

      [16] The plaintiff in that case claimed violations of New
Jersey's Conscientious Employee Protection Act ("CEPA"), N.J.S.A.
34:19-1 to -8.  Nardello, 377 N.J. Super. at 432.

coerced into resigning as a leader and member of the SWAT team; certain of his job responsibilities were initially transferred to another officer, and eventually all supervisory authority and responsibility was taken away; he was accused of being mentally unstable; he was given demeaning jobs relative to his rank such as removing and installing an alarm in the stairwell, overseeing a building project, and performing maintenance of toilets; and was prohibited from working on assignments customarily reserved for  other such high ranking officers.  Id. at 432.

The court held that the plaintiff was able to demonstrate a prima facie claim for retaliatory conduct even though many of the incidents complained of were "relatively minor," because the jury could have concluded that they combined to demonstrate a pattern of unlawful retaliatory conduct.  See Farrell v. Planters Lifesavers Co., 206 F.2d 271, 280 (3d Cir. 2000) ("[T]he proffered evidence, looked at as a whole, may suffice to raise the inference [of retaliatory animus under Title VII].")

Here, unlike Hampton and Nardello, the temporary reassignments did not materially alter the terms of Plaintiff's employment.  Unlike the plaintiff in Hampton, Dieser was not removed permanently from his position.  Indeed, during the relevant period Plaintiff remained permanently assigned to his bidded position.  Moreover, Plaintiff was reassigned to duties typically performed by other sheriff's officers or, in some

20

instances, more senior ranking officers.  He was not, as was the
Plaintiff in Nardello, asked to perform menial tasks.  Moreover,
Plaintiff's reassignments were relatively infrequent, even when
viewed as a whole over the relevant period.  Although the total
number of reassignments per year increased slightly following the
September 2001 incident, they remained relatively infrequent,
averaging only two times per month.[17]

For these reasons, the Court finds that at best the
reassignments constituted temporary lateral transfers.  And,
"[o]bviously, a purely lateral transfer, that is, a transfer that
does not involve a demotion in form or substance, cannot rise to
the level of a materially adverse employment action.  A transfer
involving no reduction in pay and no more than a minor change in
working conditions will not do, either."  Williams v. Bristol-
Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996) (holding
transfer was not a demotion even though plaintiff's commission
income "fell precipitately" the year following his transfer).
"Based on objective factors like hours, pay, benefits, and
seniority, the new positions were essentially the same as" his
other position.  Bacone, 2004 U.S. App. LEXIS 20592, at *4
(citing Robinson, 120 F.3d at 1300 ("[R]etaliatory conduct must

---

[17] For reasons already explained, reassignments to warrants,
extraditions, fingerprinting, evidence control and transport can
not under these circumstances constitute adverse employment
action.

be serious and tangible enough to alter an employee's
compensation, terms, conditions, or privileges of employment . .
. .")).

Finally, to the extent Plaintiff claims that the
reassignments amounted to retaliatory harassment, the Court is
likewise unpersuaded that any reasonable jury could so find.  In
Jensen v. Potter, 435 F.3d 444 (3d Cir. 2005), the Third Circuit
recognized a retaliatory harassment claim under Title VII arising
from a series of events that began when the plaintiff reported an
unwanted sexual proposition.  Almost immediately following the
incident, at least one co-worker "began to pepper [the plaintiff]
with insults" with "pounding regularity."  Id. at 447, 452.
Another co-worker repeatedly physically threatened the plaintiff.
Finally, almost one year following the underlying incident, the
plaintiff was the victim of at least four instances of property
damage to her car.  The court held that "these incidents'
severity and the insults' frequency combine to raise a material
question of fact as to whether retaliatory harassment 'permeated'
the workplace and changed the terms or conditions of [the
plaintiff's] employment."  Id. at 452.

As already explained, the alleged instances of retaliation
in this case, when viewed as a whole, occurred with substantially
less regularity and severity than in Jensen.  Unlike that case,
where the plaintiff confronted, among other things, two to three

22

personal sexual insults <u>per week</u>, Plaintiff here was temporarily reassigned to jobs of comparable importance on average only two times <u>per month</u>.  Simply stated, the reassignments were not severe or pervasive enough to alter the terms or conditions of Plaintiffs' employment.  For these reasons, Plaintiff also has not put forth sufficient proofs to support a claim of retaliatory harassment.

The Court does hold, however, that there are material issues of disputed fact as to whether Plaintiff's transfer from the first response team in the K-9 unit to the reserve team, and his eventual removal from the Unit, constituted an adverse employment action.  As already noted, as a member of the first-response team Plaintiff was able to respond immediately to K-9 calls.  After the September 25th incident, however, Plaintiff claims he was ordered to leave King at home while he performed his assigned duties.  Thus, whenever a K-9 call went out, Plaintiff would have to first travel home to retrieve King.  Plaintiff alleges that on several occasions where an immediate response was needed, he was told not to respond because it would take too long for him to first return home for King.  (<u>Id.</u> at 114:24-115:6.)  Finally, following King's death on March 29, 2002, Plaintiff was permanently removed from the K-9 unit.

Unlike the reassignments discussed above, the transfer of Plaintiff to the reserve team of the K-9 Unit could, if

unexplained satisfactorily by the employer, be found by a reasonable jury to constitute adverse employment action such that the terms and conditions of his employment were adversely affected.  As noted, as a member of the reserve team Plaintiff was not asked to respond to calls which he otherwise previously would have been.  Additionally, Plaintiff was unable to respond to certain calls because, unlike when he was a first-responder, he no longer traveled with his K-9.  Finally, it is undisputed that Plaintiff was permanently removed from the K-9 Unit after King died.  That he was not assigned another dog could reasonably be found by a jury to be an adverse employment action.

       3.   <u>Causal Connection</u>

Finally, there must be a causal connection between the protected activity and the adverse employment action.  <u>Jensen</u>, 435 F.3d at 449 n.2 (citing <u>Nelson v. Upsala Coll.</u>, 51 F.3d 383, 386 (3d Cir. 1995)).  The "proffered evidence, looked at as a whole, may suffice to raise the inference" of retaliatory intent. <u>Jensen</u>, 435 F.3d at 450 (quoting <u>Farrell</u>, 206 F.3d at 280).

Here, the Court holds first that even if the temporary reassignments constituted adverse employment action, Plaintiff is unable to demonstrate the requisite causal connection.  Indeed, Plaintiff had complained of such reassignments prior to the

underlying incident.[18]   (See Pl. Ex. F.)  Moreover, the record
does not support that the reassignments occurred with greater
frequency.  By his own account, Dieser was reassigned twice
between September 1st and 25th.  Not including reassignments to
warrants, extraditions, fingerprinting, evidence control and
transport, see supra, Plaintiff was frequently reassigned two (or
fewer) times per month during the relevant period – January 2002,
February 2002, March 2002, June 2002, July 2002, August 2002,
September 2002, November 2002, December 2002, January 2003,
February 2003, March 2003, April 2003, May 2003, July 2003,
August 2003, September 2003 and January 2004.  (See Pl. Ex. S.)
Because Plaintiff has not offered proofs that the frequency of
reassignments generally increased following the incident,
Plaintiff can not demonstrate causation.  Even if, as Plaintiff
alleges, he was reassigned more frequently than comparable
officers, that practice also predated his complaint about Long's
racial remark; to the extent he was treated worse than others,
that practice began before the Long incident occurred, with
roughly the same intensity.

      As to the transfer within the K-9 unit, though, the Court
holds that Plaintiff may be able to demonstrate the requisite
"causal connection" between the protected activity and the

_____

      [18] The reassignment giving rise to that grievance occurred on
September 23, 2001, several day prior to the incident giving rise
to this dispute.  (Pl. Ex. F.)

adverse employment action.  See Nelson, 51 F.3d at 386.
Specifically, the transfer to the reserve unit occurred shortly
after Plaintiff reported the alleged discriminatory incident.
This temporal proximity is probative of retaliatory intent.  See
Jenner, 435 F.3d at 450.  Accordingly, the Court holds that a
reasonable jury could find that the decision to transfer
Plaintiff to a reserve role, and then ultimately to remove him
from the Unit altogether, was motivated by retaliatory animus.

    For the foregoing reasons, the Court determines as a matter
of law that Plaintiff can not demonstrate a prima facie case of
retaliation as to the reassignments.  However, the Court is
satisfied that a reasonable jury could conclude that Plaintiff is
able to satisfy his prima facie case with regard to his transfer
within, and ultimate removal from, the K-9 Unit.  With respect to
this sole remaining claim, therefore, the Court will next examine
Defendant's proffered reason and whether Plaintiff offers proof
of pretext.

    C.   Burden Shifting Under Title VII

         1.   Legitimate Non-Discriminatory Reason

    Once an employee establishes a prima facie case of
retaliation, the employer must present a "legitimate, non-
retaliatory reason for its adverse employment action."  Hazen,
2004 U.S. App. LEXIS 21467, at * 2-3 (citing Woodson v. Scott
Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997)).  "The employer

26

need not prove that the articulated reason actually motivated the adverse employment action." Hazen, 2004 U.S. App. LEXIS 21467, at * 2-3 (citing Woodson, 109 F.3d at 920 n.2).

Here, Defendant asserts that Plaintiff was reassigned to the K-9 reserve unit because he and King were more productive in that capacity. (Def. Ex. O.)  As Sheriff Miller's January 14th memo pointed out, in the year preceding the transfer, Plaintiff was primarily responding in a support role in any event.  (Id.) These reasons were offered roughly contemporaneously to the events in 2001-02, and not as a post-hoc rationalization in litigation.  Likewise, the Court holds that a jury could find that similar reasons motivated the decision to remove Plaintiff from the K-9 Unit following King's death, since King was not replaced and no other position was available in the K-9 Unit.

In sum, the Court finds that a reasonable jury could find that the explanations offered by Defendant are legitimate and non-discriminatory.

        2.   Pretext

Lastly, assuming Defendant is able to proffer a legitimate non-discriminatory reason for his transfer within, and removal from, the K-9 Unit, Plaintiff must ultimately convince the factfinder that the proffer is pretext.  For reasons now explained, the Court holds that Plaintiff has failed to proffer such evidence from which a jury could reasonably conclude that

27

Defendant's reasons are pretextual and that a desire to retaliate against Plaintiff for exercise of protected Title VII rights was the real reason.

The Third Circuit has recognized two ways in which a plaintiff can prove pretext.  First, the plaintiff can present evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication."  Parks v. Rumsfeld, 2005 U.S. Dist. LEXIS 150, at *4-5 (3d Cir. Jan. 5, 2005) (unpublished opinion) (quoting Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).  This prong is intentionally a "stringent standard" for plaintiffs because "federal courts are not arbitral boards ruling on the strength of [the employment decision].  The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]."  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

Alternatively, a plaintiff may demonstrate "weaknesses, implausibilities, inconsistences, incoherencies, or contradiction in the employer's proffered legitimate reasons for its actions" such that the "employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'"  Jones v. School Dist. Of Philadelphia, 198 F.3d 403, 413 (3d Cir. 1999) (quoting Keller v.

Orix Credit Alliance, 130 F.3d 1101, 1108-09 (3d Cir. 1997));
Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

Plaintiff here argues that the proffered reason for the transfer to K-9 reserve team is pretext because it resulted in a decrease, not increase, in community protection. (Pl. Opp. Br. at 26.) In support of this contention, Plaintiff cites the fact that he and King were unable on numerous occasions between September and December, 2001, to respond to K-9 calls. (Id.) In the first instance, that Plaintiff and King did not respond does not mean that other K-9 teams were unable to do so. In any event, so long as the employer's articulated reason was not "'so plainly wrong that it cannot have been the employer's real reason,'" Jones, 198 F.3d at 413 (quoting Keller, 130 F.3d at 1108-09), the Court will not find pretext. In other words, the Court will not reject Defendant's nondiscriminatory reason for the transfer simply because the Sheriff's decision may have been a poor one. See Fuentes v. Perskie, 32 F.3d at 765. ("To discredit the employer's proffered reason, [] the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . .").

As discussed above, Sheriff Gilbert Miller, III, explained his decision to transfer Plaintiff and King to a "support role" in the January 14, 2002 internal memorandum. Sheriff Miller explained, in part:

> [Plaintiff received] less than one call per month
> during duty time.  In addition, it was pointed out to
> Officer Dieser that most of those calls were responding
> in the "support mode" and not as a first responder.
> The K-9 teams assigned to the Gloucester County
> Sheriff's Department that are more likely to be called
> as first responders will continue to have their K-9
> partners with them for speedy access. . . .
>
> It is my decision and belief that Officer Dieser would
> be more productive to the Gloucester County Sheriff's
> Department and the citizens of Gloucester County
> functioning in his present assignment in the Field
> Services Bureau. . . .
>
> I emphasize that the safety of the residents of this
> county was foremost in my decision and [my decision]
> was not made lightly.

(Def. Ex. O.)  Plaintiff has failed to provide proofs which could
convince a finder of fact "both that the reason was false, and
that discrimination was the real reason." St. Mary's Honor Ctr.
v. Hicks, 509 U.S. 502, 515, (1993).  For example, Plaintiff has
come forward with no evidence that the factual premises of the
Sheriff's decision were wrong or distorted.  Accordingly, the
Court holds as a matter of law that Plaintiff can not demonstrate
Defendant's proffered reasons for the transfer were pretextual.

Likewise, Plaintiff has failed to demonstrate how
Defendant's explanation for its decision to remove Plaintiff from
the K-9 Unit was pretext.  Plaintiff was removed from the K-9
Unit only after King died.  Thus, in addition to the reasons
already set forth, Defendant's decision to remove Dieser from the
K-9 Unit is also supported by the added expense of training a new
dog.  Plaintiff has not offered any proofs, though, tending to

30

demonstrate how a reasonable jury could conclude that these reasons are pretext.  No evidence suggests that King was replaced or that there was an opening for Plaintiff in the K-9 Unit. Accordingly, the Court holds that Plaintiff is unable as a matter of law to satisfy his burden under Title VII.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment both as it pertains to all temporary reassignments and to Plaintiff's transfer within, and removal from, the K-9 unit.

**March 29, 2006**                              **s/ Jerome B. Simandle**
Date                                                    JEROME B. SIMANDLE
                                                            U.S. District Judge

31